Filed 3/23/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| UBER TECHNOLOGIES PRICING CASES. | A154694<br><br>(San Francisco City & County Super. Ct. No. CJC17004925 & JCCP No. 4925) |

Plaintiffs—several taxi companies and taxi medallion owners—filed suit against Uber Technologies, Inc. alleging violation of the Unfair Practices Act's (UPA) prohibition against below-cost sales (Bus & Prof. Code, § 17043)[1] and, in turn, violation of the Unfair Competition Law (UCL) (§ 17200 et seq.).

The UPA, in pertinent part, makes it unlawful "for any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition." (§ 17043.) However, the Act, by its terms, does not apply "[t]o any service, article or product for which rates are established under the jurisdiction of the [California] Public Utilities Commission [(CPUC)] . . . and sold or furnished by any public utility corporation." (§ 17024(1).) The parties agree Uber is a "public utility corporation" for purposes of section 17024, as the term applies

_____

[1] All further statutory references are to the Business and Professions Code unless otherwise indicated.

1

to a privately-owned corporation that provides public utility services, such as transportation. They also agree Uber is subject to the jurisdiction of the CPUC.

Their singular dispute over the applicability of the statutory exemption arises out of the fact that while the CPUC has conducted extensive regulatory proceedings in connection with Uber's business, the commission has not yet established the rates for any service or product Uber provides. In short, the parties disagree as to whether the statutory exemption applies only when the CPUC has actually set rates, or applies more broadly, where the CPUC has the jurisdiction to set rates, regardless of whether it has chosen to do so.

The trial court ruled the exemption applies when the CPUC has jurisdiction to set rates, regardless of whether it has yet done so, and sustained Uber's demurrer with leave to amend. When plaintiffs elected not to do so, the court entered a judgment of dismissal. We affirm. In doing so, we reach the same conclusion as to the applicability of section 17024(1) as have three California federal district courts, two within the last year, in cases alleging identical UPA claims against Uber.

## BACKGROUND[2]

Uber provides transportation services to the public for a fee by connecting consumers to its " ' "partner drivers" ' " through use of its proprietary GPS-enabled smartphone application. (*Goncharov v. Uber Technologies, Inc.* (2018) 19 Cal.App.5th 1157, 1161 (*Goncharov*).)

Plaintiff Eyad Ariekat, a taxi medallion owner,[3] filed a class action complaint in March 2017 against Uber in the San Francisco Superior Court,

---

[2] We provide only a summary overview of the case here and discuss the parties' statutory claims in detail in connection with our discussion of the issues on appeal.

alleging predatory pricing in violation of the UPA (§ 17403) and unlawful and unfair business practices in violation of the UCL (§ 17200). A month later, Yellow Cab Company Peninsula, Inc. et al., filed a complaint against Uber in the Santa Clara Superior Court, alleging the same causes of action. Shortly thereafter, Friendly Cab Company, Inc., filed a like complaint against Uber in the Alameda County Superior Court. The Judicial Council coordinated the three actions in San Francisco under the title Uber Technologies Pricing Cases (JCCP No. 4952).[4] (Code Civ. Proc., § 404 et seq.; Cal. Rules of Court, rule 3.550.) Plaintiffs then filed a first amended complaint, once again alleging predatory pricing in violation of the UPA and the UCL.

In a nutshell, plaintiffs alleged Uber set prices for its ride services below their average total cost, for the "specific purpose of injuring and eliminating its competitors in the traditional taxi business." They sought damages and injunctive relief.

Uber demurred asserting, among other things, that the statutory exemption set forth in section 17024(1), foreclosed plaintiffs' claims under the UPA and, in turn, their derivative claims under the UCL. Uber maintained the section 17024(1) "exclusion precludes the application of Section 17043 (and other UPA provisions) to services provided by certain private parties that are within the jurisdiction of the CPUC." It further asserted plaintiffs

---

[3] A medallion is "a permit issued by [the San Francisco Municipal Transit Authority] to an individual, joint tenants, or a Business Entity to operate a Taxi or Ramp Taxi vehicle" in the City of San Francisco. (S.F. Transportation Code, § 1102.)

[4] This coordinated action includes three cases: *Ariekat v. Uber Technologies, Inc.* (S.F. Super Ct. case No. CGC-17-557728); *Yellow Cab Company Peninsula, Inc. et al. v. Uber Technologies, Inc.* (Santa Clara Super. Ct. case No. 17CV308084); and *Friendly Cab Company, Inc. v. Uber Technologies, Inc.* (Alameda Super. Ct. case No. RG17858247).

had failed to "plead facts demonstrating [Uber's] 'business activity is outside the exemption contained in Business and Professions Code section 17024.' "

Plaintiffs responded that "Uber's argument is based on a misreading of the statute," and that section 17024(1) "only creates an exemption from UPA claims if the CPUC actually establishes rates for good or services at issue." Since the CPUC has not yet actually set Uber's prices, the statutory exemption, according to plaintiffs, does not apply.

The trial court summarized the parties' differing views as follows: (1) Uber's position is "that if the statute provides jurisdiction, we're done"; (2) plaintiffs' position is that "until and unless something has actually been done in a rate-setting area, you're not immune from an attack on a below-cost basis." The court also posited an "intermediary position"—that the exemption is triggered when the CPUC has "started exercising its jurisdiction with respect to Uber in some way."

The trial court subsequently issued a written order sustaining Uber's demurrer with leave to amend, ruling section 17024(1), "in a straightforward manner creates the exemption (from below-cost pricing liability) to entities overtly within the jurisdiction" of the CPUC. When plaintiffs elected not to amend, the court entered a judgment of dismissal.

## DISCUSSION

### *Jurisdiction—Public Utilities Code Section 1759*

For the first time in its respondent's brief, Uber contends that under Public Utilities Code section 1759, the trial court lacked jurisdiction over the case and the judgment of dismissal can, and should, be affirmed on this basis. We conclude there is no merit to Uber's belated jurisdictional challenge.

"The CPUC is a state agency of constitutional origin and possesses broad authority to supervise and regulate every public utility in California.

4

(Cal. Const., art. XII, §§ 1–6.)  It has the power to 'do all things, whether specifically designated in [the Public Utilities Act] or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction.'  ([Pub. Util. Code,] § 701.)  Its powers include setting rates, establishing rules, holding hearings, awarding reparation, and establishing its own procedures.  (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 915 . . . (*Covalt*).)  ' "The commission's authority has been liberally construed" [citation], and includes not only administrative but also legislative and judicial powers.' "  (*Goncharov, supra*, 19 Cal.App.5th at p. 1168.)

Public Utilities Code section 1759 was enacted to limit judicial review of CPUC actions.  It provides in pertinent part:  "No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law, and the rules of court."  (Pub. Util. Code, § 1759, subd. (a).)

"However, this provision, 'is not intended to, and does not, immunize or insulate a public utility from any and all civil actions brought in superior court.' [Citation.]  The Legislature ' "provided for a private right of action against utilities for unlawful activities and conduct" '[citation] by enacting [Public Utility Code] section 2106:  'Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for

5

all loss, damages, or injury caused thereby or resulting therefrom. . . . An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person.' " (*Goncharov, supra,* 19 Cal.App.5th at pp. 1168–1169.)

In *Covalt, supra,* 13 Cal.4th 893, "the California Supreme Court established the test to determine whether an action is barred by section 1759. [Citation.] There, the plaintiffs filed an action to obtain damages and injunctive relief from an electric company for alleged harm caused by electromagnetic radiation (EMFs) emitted from power lines based on trespass and nuisance theories. [Citation.] The *Covalt* court concluded that the CPUC had exclusive jurisdiction over the nuisance clam, in large part because the plaintiffs sought a ruling directly contrary to the CPUC's decision that EMFs did not pose a substantial risk of harm and that utilities therefore need not take steps to reduce EMFs. [Citation.] In reaching its decision, the *Covalt* court 'set forth a three-part inquiry for evaluating whether an action is precluded by [Public Utilities Code] section 1759: (1) whether the CPUC has authority to adopt regulatory policy on the issue in question; (2) whether the CPUC has exercised that regulatory authority; and (3) whether the superior court action would hinder or interfere with the CPUC's exercise of that regulatory authority.' " (*City and County of San Francisco v. Uber Technologies, Inc.* (2019) 36 Cal.App.5th 66, 79, quoting *Goncharov, supra,* 19 Cal.App.5th at p. 1170.)

Given that Uber belatedly raised its jurisdictional challenge and did so in only a cursory manner, and plaintiffs did not file a reply brief, we asked the parties for supplemental briefing addressing the three-part *Covalt* test.

Upon review of the submitted materials, we agree with plaintiffs that while extensive rulemaking is still ongoing, nothing indicates the CPUC is

6

contemplating imminent exercise of its authority to set rates for transportation network companies and charter-party carriers such as Uber. While Uber asserts the commission has exercised its authority on "rate-related matters" by ordering transportation network companies to submit reports "identifying 'the amount paid/donated' for rides," and "showing certain fares were 'calculated using time and/or distance,' " this hardly suggests the commission is exercising its authority to set Uber's rates. Rather, it indicates the commission is currently gathering information on how Uber calculates its fares. At most, this hints the commission may exercise its rate setting authority in the future.

Uber's reliance on *Goncharov, supra*, 19 Cal.App.5th 1157, is misplaced. In that case, the plaintiffs alleged Uber had "operated and advertised itself as a public transportation company without the requisite regulatory approvals" from the commission. (*Id.* at p. 1163.) The trial court ruled it lacked jurisdiction under Public Utilities Code section 1759 because the essence of the complaint was that Uber was " 'acting as an unlicensed charter-party carrier in violation of [C]PUC regulations,' " and the CPUC was in the midst of determining Uber's charter-party carrier status. Accordingly, any award of damages, said the court, " 'could only be premised upon a finding that Uber vehicles are illegally operating either as charter-party carriers or as taxicabs' "—a finding which could or would " 'directly contravene[] those of the [C]PUC.' " (*Goncharov*, at p. 1164.)

This court affirmed. "The CPUC's evaluation of whether Uber is a charter-party carrier and what regulations should apply is not merely informational," but rather is "an express focus of the CPUC's formal Rulemaking regarding Uber and TNC's." (*Goncharov, supra,* 19 Cal.App.5th at p. 1171.) Thus, "[a]ny determination regarding Uber's status would strike

7

at the heart of this process," "any finding by the CPUC on this issue would be directly related to its ongoing efforts to regulate Uber and TNC's," and any judicial ruling "to the contrary could potentially undermine this process." (*Ibid.*)

That is not the case here.

Indeed, the trial court squarely asked Uber the very question that, under *Goncharov,* is pertinent to jurisdiction: "Has the CPUC ruled in some way, or literally exerted its authority, to tell Uber that its rates are too high or too low, or to otherwise regulate the actual rate itself? I understand it's secured information and it's got a lot of other governing actions in terms of informing itself about what's going on, but has the CPUC actually made an effort or told you that your prices have to be higher or lower or they have to be calculated in a certain way? Have they actually addressed their rates themselves which are the subject of this lawsuit?" Uber squarely responded: "No, Your Honor."

In short, while the CPUC may be seeking information on how Uber sets its rates, there is no evidence that in the seven years the rulemaking proceeding involving Uber has been ongoing the commission has set its sights on setting Uber's fares.[5] It may do so in the future, but that is not sufficient to divest the jurisdiction of the courts. (See *City and County of San Francisco v. Uber Technologies, Inc., supra,* 36 Cal.App.5th at pp. 78–79 [Uber's CPUC preemption argument was "premature," as the city was "far from seeking a finding of liability against Uber" and was "at the preliminary investigatory stage."].)

---

[5] We grant Uber's request for judicial notice of certain "orders, decisions, and rulings of the California Public Utilities Commission" (which consisted of thousands of pages of material). (Evid. Code, §§ 452, 459.)

We therefore proceed to the merits of the statutory exemption issue before us.

### *Statutory Exemption—Section 17024(1)*[6]

The parties advance on appeal the same arguments they made in the trial court.  Plaintiffs maintain the statutory exemption to the UPA set forth in section 17240(1), does not apply because the CPUC, while having the authority to regulate Uber's fares, has not yet done so.  Uber maintains that because the CPUC indisputably has jurisdiction over it (and, indeed, has commenced extended regulatory proceedings that remain ongoing), the statutory exemption applies.  As we indicated at the outset, three different federal district court judges in other UPA cases against Uber have concluded the exemption applies.  (*SC Innovations, Inc. v. Uber Technologies, Inc.* (N.D. Cal. 2020) 2020 WL 353543, *11–12 (*SC Innovations*); *Diva Limousine, Ltd. v. Uber Techs., Inc.* (N.D. Cal. 2019) 392 F.Supp.3d 1074, 1085–1090 (*Diva Limousine*); *Desoto Cab Co., Inc. v. Uber Technologies, Inc.* (N.D. Cal. 2018) 2018 WL 10247483, *10–11.)  We reach the same conclusion.

" 'Under well-established rules of statutory construction, we must ascertain the intent of the drafters so as to effectuate the purpose of the law.

---

[6] Our standard of review is well-established.  On appeal from a judgment of dismissal after a demurrer is sustained, the reviewing court "assumes the truth of all facts properly pleaded by the plaintiff.  [Citations.]  We also accept as true all facts that may be implied or reasonably inferred from those expressly alleged.  [Citation.]  We do not assume the truth of ' " 'contentions, deductions or conclusions of fact or law.' " '  [Citations.]  We review the trial court's action de novo and exercise our own independent judgment whether a cause of action has been stated under any legal theory."  (*Buller v. Sutter Health* (2008) 160 Cal.App.4th 981, 985–986; *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.)  Because plaintiffs elected not to amend, " ' "strict construction of the complaint is required and it must be presumed that the plaintiff has stated as strong a case as he can." ' "  (*Goncharov, supra*, 19 Cal.App.5th at p. 1165.)

[Citation.] Because the statutory language is generally the most reliable indicator of legislative intent, we first examine the words themselves, giving them their usual and ordinary meaning and construing them in context. [Citation.] When statutory language is clear and unambiguous, " 'there is no need for construction and courts should not indulge in it.' " ' " (*Bernard v. City of Oakland* (2012) 202 Cal.App.4th 1553, 1560–1561.)

However, "[w]hen the plain language of the statute does not resolve the interpretive question, we proceed to the second step of our inquiry. At this stage, we 'may turn to rules or maxims of constructions "which serve as aids in the sense that they express familiar insights about conventional language usage." ' [Citations.] In addition, '[i]f the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' " (*Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 582–583 (*Ailanto Properties*).)

"If the meaning of the statute remains unclear after examination of both the statute's plain language and its legislative history, then we proceed cautiously to the third and final step of the interpretive process. [Citation.] At this final stage of the process, we apply 'reason, practicality, and common sense to the language at hand.' [Citation.] The words of the statute should be interpreted 'to make them workable and reasonable.' [Citation.] We will also consider the consequences that will flow from a particular statutory interpretation. [Citation.] 'In determining what the Legislature intended we are bound to consider not only the words used, but also other matters, "such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy and

10

contemporaneous construction." ' " (*Ailanto Properties, supra,* 142 Cal.App.4th at p. 583.)

The statutory exemption to the UPA with which we are concerned provides: "Nothing in this chapter applies: [¶] (1) To any service, article or product *for which rates are established* under the jurisdiction of the Public Utilities Commission of this State and sold or furnished by any public utility corporation, or installation and repair services rendered in connection with any services, articles or products. [¶] (2) To any service, article or product sold or furnished by a publicly owned public utility and *upon which the rates would have been established* under the jurisdiction of the Public Utilities Commission of this State if such service, article or product had been sold or furnished by a public utility corporation, or installation or repair services rendered in connection with any services, articles or products." (§ 17024(1) & (2), italics added.) In short, subsection (1) provides an exemption for privately owned public utility corporations, whereas subsection (2) provides an exemption for publically owned public utility corporations.[7]

Plaintiffs ground their assertion that the section 17024(1) exemption is inapplicable on the phrase "*for which rates are established* under the jurisdiction of the [CPUC]." (Italics added.) In their view, this language plainly requires that the CPUC must have actually set a public utility corporation's rates before the exemption applies. This is underscored, they

---

[7] In the instant context, a "public utility corporation" is an entity that operates a "system for the transportation of people." (*Hladek v. City of Merced* (1977) 69 Cal.App.3d 585, 590; see Pub. Util. Code, § 216, subd. (a)(1) [Public utility "includes every common carrier . . . , where the service is performed for, or the commodity is delivered to, the public or any portion thereof."]; *id.,* § 211 [A common carrier "means every person and corporation providing transportation for compensation to or for the public or any portion thereof."].)

11

say, by the different language employed in subsection (2) pertaining to services provided by a publicly-owned public utility corporation "*upon which the rates would have been established* under the jurisdiction of the [CPUC]" (italics added) had the services been provided by a privately owned public utility corporation.

Uber acknowledges the CPUC has not yet "exerted its authority, to tell Uber that its rates are too high or too low, or to otherwise regulate the actual rate itself," but maintains that is not determinative. Rather, according to Uber, the pivotal facts are two-fold. One, the company is subject to the jurisdiction of the CPUC. And, two, the CPUC has the authority to regulate Uber's rates should it choose to do so. As for the slightly different wording of subsections (1) and (2) of the statutory exemption, Uber maintains it reflects the fact the CPUC generally lacks jurisdiction over municipally-owned public utility corporations and subsection (2) extends to these municipal-owned entities the same UPA exemption provided to privately owned entities under subsection (1).

Uber has the better view, as the federal district court explained in *Diva Limousine, supra,* 392 F.Supp.3d 1074, in a particularly thorough order granting a motion to dismiss UPA below-cost claims against the company.

The Public Utilities Code "expressly provides that it is within the CPUC's discretion to regulate public utilities within its jurisdiction, including by setting rates, but that the CPUC is not required to do so in all instances." (*Diva Limousine, supra,* 392 F.Supp.3d at p. 1086, citing Pub. Util. Code, § 701 ["commission may supervise and regulate every public utility in the State and may do all things . . . necessary and convenient in the exercise of such power and jurisdiction"]; *id.,* § 728.5, subd. (a) ["commission may establish rates or charges for the transportation of passengers and freight by

12

railroads and other transportation companies. . . ."].)  The state constitution similarly provides that the CPUC " '*may* fix rates for all public utilities subject to its jurisdiction[.]' " (*Diva Limousine,* at p. 1086, citing Cal. Const. art. XII, § 6; see *id.*, art. XII, § 4 [commission "may fix rates and establish rules for the transportation of passengers"].)  This context "lends credence" to the view "that the rates established by a public utility which are merely subject to the CPUC's jurisdiction are 'rates . . . established under the jurisdiction of' [the] CPUC[,] irrespective of whether the CPUC actually exercises its rate setting authority." (*Diva Limousine,* at p. 1086.)

As *Diva Limousine* notes, the language of section 17024, like that of many statutes, is not a paragon of clarity.  (*Diva Limousine, supra,* 392 F.Supp.3d at p. 1086, fn. 4.)  However, the broader view of the statutory language—that the statutory exemption turns on the jurisdictional authority of the CPUC to regulate rates, and not on whether the commission has chosen to exercise its power in a particular instance—"is supported by the fact that the statutory scheme allows the CPUC to consider anticompetitive concerns when regulating public utility corporations like Uber." (*Id.* at p. 1086.)

The commission has been "given broad authority to 'supervise and regulate every charter-party carrier of passengers in the State and may do all things, whether specifically designated in this part, or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction.' " (*Diva Limousine, supra,* 392 F.Supp.3d at pp. 1086–1087, quoting Pub. Util. Code, § 5381.)  "In particular, charter-party carriers are required to obtain 'a certificate [of] public convenience and necessity' from the CPUC to operate." (*Diva Limousine,* at p. 1086, quoting Pub. Util. Code, § 5371.)  And in "granting a certificate of public convenience and necessity,

13

the CPUC 'may attach to the permit or certificate such terms and conditions as, in its judgment, are required in the public interest.' " (*Diva Limousine,* at p. 1086*,* quoting Pub. Util. Code, § 5375.)  Further, "[a]lthough the Public Utilities Code does not expressly require the CPUC to weigh anticompetitive concerns, courts have observed that 'the [C]PUC undoubtedly does "take antitrust considerations into account in determining whether a [transaction] will advance the public interest." ' " (*Diva Limousine,* at p. 1087.)  Thus, that the CPUC "retains authority to address anticompetitive behavior in regulating charter-party carriers," like Uber, indicates the Legislature "intended to leave to the CPUC the field of regulating and monitoring prices of utilities under its jurisdiction."[8] (*Diva Limousine,* at p. 1087.)

As *Diva Limousine* went on to point out, plaintiffs' insistence that the CPUC must have exercised its rate fixing authority and have set rates before the statutory exemption applies would read "critical words out of the statute"—specifically, it would excise "the operative phrase 'under the jurisdiction of' from [section] 17024(1) and replace[] it with "by the CPUC." ' " (*Diva Limousine, supra,* 392 F.Supp.3d at p. 1087.)  This would, of course, contravene one of the fundamental rules of statutory construction.  (See *Abbott Laboratories v. Franchise Tax Bd.* (2009) 175 Cal.App.4th 1346, 1359 ["Deleting the language . . . from [the statute] rewrites the statute to give the statute a purpose quite different from the one enacted by the Legislature."].)

Nor, contrary to plaintiffs' assertion, does focusing on whether the CPUC has the power to regulate rates, rather than on whether it has chosen to exercise that power in a particular case, result in discord between

---

[8]  That the CPUC can, and does, take into account anticompetitive conduct in issuing approvals, as well as setting rates if it chooses to do so, thus belies plaintiffs' strident claim that finding the exemption applicable will "completely subvert" the purpose of the UPA.

subsections (1) and (2) of the statute.  As we have observed, subsection (1) of section 17024 exempts privately-owned public utility corporations from the UPA's proscriptions, whereas subsection (2) exempts publicly-owned public utility corporations.  The latter, however, are generally not subject to the jurisdiction of the CPUC.  (*County of Inyo v. Public Utilities Com.* (1980) 26 Cal.3d 154, 166–167 [unless expressly authorized by statute, CPUC has no jurisdiction over municipal utilities].)

Thus, as *Diva Limousine* concluded, the " 'would have been established under the jurisdiction of the [CPUC] if such service, article, or product had been sold or furnished by a [private] public utility corporation' " language in subsection (2) has a straightforward and "logical purpose."  (*Diva Limousine, supra,* 392 F.Supp.3d at p. 1088, italics omitted.)  Namely, it reflects the fact that generally the CPUC does not have jurisdiction over publicly-owned public utility corporations and provides the necessary analogy to privately-owned public utility corporations to ensure that the UPA exemption applies equally to privately-owned and publicly-owned utilities.  (*Diva Limousine,* at pp. 1087–1088.)

Neither party has directed our attention to any legislative history bearing on the issue before us.  We note, however, that when the progenitor of the UPA was enacted in 1913, it excluded from its unfair competition and price discrimination prohibitions any "reasonable classification of service by public utilities for the purpose of establishing rates," without distinguishing between privately-owned and publicly-owned utilities.  (1913, ch. 276, § 1.)  This language remained largely unchanged until 1937, when the current language appeared, distinguishing between privately-owned utilities (then subject to the jurisdiction of the Railroad Commission) and publically-owned utilities.  (1937, ch. 860, § 1.)  Four years later, the statute was amended and

15

the UPA was recodified in the Business and Professions Code, with the existing exemption for public utility corporations placed in the new section 17024, subsections (1) and (2). (1941, ch. 526, § 17024.) This statutory language has remained unchanged for the past 60 years, except for replacement of "Railroad Commission" with "Public Utilities Commission." (1959, ch. 1638, § 17024.) In short, it appears this longstanding exemption for public utility corporations was both uncontroversial and intended to apply evenhandedly to all such utility corporations, whether privately or publicly owned.

This brings us to the significance of *Hladek, supra,* 69 Cal.App.3d 585, a case that has never been criticized and was cited by all three federal district courts as supporting the applicability of the statutory exemption where the CPUC has jurisdiction to set rates. In *Hladek*, several privately owned " 'dial-a-bus, dial-a-ride' " services sued the City of Merced under the UPA when the city began operating a competing, and lower cost, transportation service. (*Id.* at p. 588.) Because the city service was a publicly-owned public utility corporation, the city invoked subsection (2) of section 17024. The "pivotal issue," stated the appellate court, was "whether the [CPUC] would have the jurisdiction to establish the rates for such service if it had been sold or furnished by a privately owned public utility." (*Id.* at p. 590.) The court then examined whether the particular kind of service the city was providing, were it being provided by a private entity, would fall within the CPUC's rate-setting powers. (*Id.* at pp. 590–591.) Because the plaintiffs had not alleged a service falling outside the bounds of the CPUC's rate setting authority, they failed to allege that the CPUC "would not have had jurisdiction to set rates for [the city's] transportation service if the service were provided by a privately owned public utility corporation." (*Id.* at

16

p. 591.) Accordingly, the court affirmed the dismissal of the case.[9] (*Id.* at p. 91.)

As the court commented in *Diva Limousine, Hladek* considered only whether the CPUC " 'would have had jurisdiction' " to set rates, not whether it would have exercised its jurisdiction to do so. (*Diva Limousine, supra,* 392 F.Supp.3d at p. 1088; accord, *SC Innovations, Inc., supra,* 2020 WL 353543, *11 ["the *Hladek* court did not look to whether the CPUC would in fact have set rates for the city's transportation service if it had been run by a private entity, but rather whether it would have had *jurisdiction* to do so"]; see Cal. Civil Practice (Thomas Reuters 2019) Business Litigation § 60:43 [UPA does not apply to "any service, article, or product sold or furnished by any public utility corporation or any publicly owned public utility" that is "subject to rate regulation by the [CPUC] or that would be subject to regulation if furnished by a public utility corporation"].)

Indeed, given that the CPUC *may*, but is not required, to set rates, subsection (2) *must* focus on whether the CPUC would have the power to regulate rates were the service being provided by a privately-owned public entity corporation and not on whether it would actually exercise that power—as the courts have no such clairvoyance when examining only an analogous context. Accordingly, to ensure that privately-owned and publicly-owned public utility corporations are treated the same under the UPA—that is, to ensure that subsection (1) has the same scope and breadth as subsection (2)—the "pivotal issue" under subsection (1), as it is under subsection (2), must be whether the CPUC has the jurisdiction to establish rates, not whether it has yet chosen to exercise that jurisdiction in a particular case.

---

[9] It also allowed the plaintiffs an opportunity to amend. (*Hladek, supra,* 69 Cal.App.3d at p. 592.) Here, however, plaintiffs were given leave to amend and declined to do so.

The answer to that pivotal issue here is undisputed—the CPUC has rate-setting jurisdiction over Uber.  Accordingly, the statutory exemption to the UPA set forth in section 17024(1), applies and the plaintiffs' UPA claims were properly dismissed.[10]

## DISPOSITION

The judgment of dismissal is affirmed.  Respondent to recover costs on appeal.

---

[10] Because plaintiffs' UCL claims were wholly derivative of their UPA claims, they were also properly dismissed.  (See *Aleksick v. 7-Eleven, Inc.* (2012) 205 Cal.App.4th 1176, 1185 [When a UCL claim is derivative of other substantive causes of actions, the dismissal of the antecedent substantive causes of action necessarily means dismissal of the UCL claim.].)

_____
Banke, J.


We concur:


_____
Humes, P.J.


_____
Margulies, J.


A154694, *Uber Technologies Pricing Cases*

Trial Court: Superior Court of the City and County of San Francisco

Trial Judge: Hon. Curtis E.A. Karnow

Counsel:

Prometheus Partners, LLP, Eduardo G. Roy, Daniel Chris Quintero, John R. Hurley, for Plaintiffs and Appellants.

Morgan, Lewis & Bockius LLP, Brian C. Rocca, Thomas M. Peterson, Kent M. Roger, Sujal J. Shah, for Defendant and Respondent.